PATRICIA W. BURKE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

L. B. WALKER AND MILDRED O. WALKER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 93517, 93518.   Filed September 9, 1964.

*Hover T. Lentz* and *James A. Ryan*, for the petitioners.
*William J. McNamara*, for the respondent.

HOYT, *Judge:* The Commissioner determined income tax deficiencies for the calendar year 1957 as follows:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 93517 | Patricia W. Burke | $393.43 |
| 93518 | L. B. and Mildred O. Walker | 13,579.71 |

These cases were consolidated for trial and brief. The sole issue is whether the distribution to petitioners in 1957 of stock of L. B. Walker Radio Co. of Grand Junction was tax free under the provisions of section 355 of the Internal Revenue Code of 1954.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner, Patricia W. Burke, is a single individual residing in Pueblo, Colo., and the petitioners, L. B. Walker and Mildred O. Walker, are husband and wife also living in Pueblo, Colo. They filed their joint Federal income tax return and Burke filed her individual income tax return for the calendar year 1957 with the district director of internal revenue for the district of Colorado at Denver, Colo.

In 1921 petitioner L. B. Walker started a business of servicing and assembling radios and selling radio parts and supplies in Pueblo, Colo. He originally operated this business as a sole proprietorship, but later it was operated in partnership form with his wife, Mildred O. Walker. Around 1930 petitioner began selling radio parts and supplies wholesale throughout southern and western Colorado and northern New Mexico. Gradually the wholesale business grew, and by 1935 petitioner was engaged almost exclusively in the wholesale distribution of radio parts and supplies.

On September 29, 1947, the business was incorporated under the laws of Colorado as the L. B. Walker Radio Co. of Pueblo (hereinafter

sometimes referred to as Pueblo) to carry on and engage in the business of wholesale distribution of radio, television, and other electronic parts, supplies, and equipment, formerly operated in the proprietorship and partnership forms. After incorporation, petitioner L. B. Walker continued to travel throughout southern and western Colorado and nothern New Mexico as a salesman soliciting orders. Petitioner Patricia W. Burke also traveled for the Pueblo company as an outside saleslady, and petitioner Mildred O. Walker worked in the Pueblo store as a saleslady.

The area around Grand Junction, Colo., which is in the western part of Colorado, was originally served by salesmen who operated out of the store and warehouse located in Pueblo. As orders for merchandise were obtained by the salesmen, they were sent to Pueblo for filling, and the merchandise was shipped directly to the customer. The business in and around the Grand Junction area continued to grow. In April of 1954, with the advent of television at Grand Junction, which, it was believed, would create an additional demand for television parts and supplies, the Pueblo company rented space and established a small branch store and warehouse in Grand Junction to better serve its customers and to further expand its business in that area.

Prior to the establishment of the Grand Junction store, L. B. Walker had had discussions concerning the operation to be located there with H. B. Pearce, a customer of the Pueblo company who operated an electrical appliance store in Rifle, Colo. As a result of these discussions, Pearce was hired as the manager at Grand Junction; he closed his business at Rifle and moved to Grand Junction when the store was opened.

After the establishment of the Grand Junction store and warehouse in 1954 but prior to the incorporation of the store as the L. B. Walker Radio Co. of Grand Junction in 1957, the area of western Colorado around Grand Junction was served by a salesman operating out of the Pueblo store. He would forward the orders to either Grand Junction or Pueblo depending upon considerations such as freight charges for shipping the merchandise to the customers, the speed with which delivery could be made, and the availability of the merchandise at Pueblo or Grand Junction. Consequently when he operated in the area west of Gunniston, Delta, Montrose, or Glenwood Springs he would usually send his orders to Grand Junction. The Grand Junction store had no outside salesmen.

The books for both Pueblo and Grand Junction were kept in Pueblo before and after the incorporation of Grand Junction. Separate books were not maintained for the Grand Junction branch nor were separate complete financial statements kept, but after incorporation a separate ledger was prepared for Grand Junction. However, suffi-

cient records were maintained before and after incorporation in order for the Pueblo company to determine whether the Grand Junction store was profitable or not. Separate retail sales tax returns were filed for all years prior to incorporation. Each store was treated as a stranger for purposes of intercompany transactions in order to make it easier for the employees to handle the transactions.

Approximately 80 percent of the merchandise sold in western Colorado was obtained directly from the Pueblo warehouse, the other 20 percent being shipped from the supplier directly to Grand Junction. In some instances the sales invoice would be sent to Grand Junction while in others it would be sent to Pueblo. If sent to Grand Junction, Pearce would approve the invoice and forward it to Pueblo for payment. If the invoice were sent to Pueblo it would be forwarded to Grand Junction for approval prior to payment. Pearce sometimes purchased merchandise directly for the Grand Junction branch especially in cases of emergency or when the item was not normally stocked by the Pueblo store.

The Grand Junction branch had a very limited inventory and we find that its operation was primarily that of an outlet closer to the area of distribution. All accounts receivable, credit matters, and collections were handled by the Pueblo store for the Grand Junction area. A bank account was maintained in Grand Junction only as a transfer account, wherein cash was deposited and accumulated until the periodic transfer, usually four or five times a month, to the main company account in Pueblo.

Through the efforts of H. B. Pearce the business in and around the Grand Junction area grew considerably after the opening of the Grand Junction branch. Since the property used by the Grand Junction branch was leased, Pearce offered to contribute land of his own so that the company might build its own store in Grand Junction. This was also to satisfy Pearce's desire to invest in and own part of the business operation in the Grand Junction area. A special meeting of the board of directors of the Pueblo company was thereafter held on December 20, 1956. At this meeting the directors decided that to enable Pearce to invest in the Grand Junction business only, they would form a new corporation; transfer certain of the assets of the Grand Junction store to the new corporation in exchange for all its stock; and thereafter distribute the stock pro rata to the Pueblo company stockholders. The resolutions of the Pueblo company board of directors passed at that special meeting were as follows:

RESOLVED, that the inventory, furniture, fixtures and equipment of L. B. Walker Radio Company of Pueblo, presently located in the Grand Junction store of said company be sold and transferred to a new corporation to be organized and known as L. B. Walker Radio Company of Grand Junction; that as consideration for said property, there be issued to the said L. B. Walker Radio Company of Pueblo shares of stock of said new corporation on the basis of $1.00 per share, the pur-

chase price to be based on the book value of said property being transferred and assigned.

\*     \*     \*     \*     \*     \*     \*

RESOLVED, that upon receipt of said stock of L. B. Walker Radio Company of Grand Junction, that the officers of L. B. Walker Radio Company of Pueblo, be and they are hereby authorized to distribute among the stockholders of said L. B. Walker Radio Company of Pueblo the shares of stock received in the L. B. Walker Radio Company of Grand Junction, in the ratio of their present stockholdings.

The L. B. Walker Radio Co. of Grand Junction, a Colorado corporation, was incorporated on January 7, 1957. The following assets of the Pueblo company located at the Grand Junction store and warehouse were transferred to the Grand Junction company:

| | |
|---|---:|
| Cash | $100. 00 |
| Merchandise inventory | 30,978. 58 |
| Equipment | 400. 00 |
| Total | 31,478. 58 |

This transaction was recorded on the Pueblo company books as follows:

| | | |
|---|---:|---:|
| Accounts receivable | $31,478. 58 | |
| Walker, G. Jct. | | |
| Petty cash fund | | $100. 00 |
| Merchandise inventory | | 30,978. 58 |
| Furniture and fixtures | | 400. 00 |

To record transfer of assets to Walker of Grand Junction in exchange for stock to be issued pro rata to stockholders of L. B. Walker Radio Company of Pueblo as of January 1, 1957.

In exchange for and in consideration of the above assets the Grand Junction company issued 31,478 shares of its $1 par value common stock. It was the intention of the directors of the Pueblo company to transfer certain of its assets to the Grand Junction company in exchange for the Grand Junction company's stock and upon receipt of the stock to distribute all of it pro rata to the Pueblo company stockholders.

The original stockbook was lost but it is known that two sets of Federal documentary stamps were purchased. The stock certificates were either issued first to the Pueblo company and then reissued pro rata to its stockholders, or directly by Grand Junction to them on a pro rata basis.[1]

The petitioners as stockholders of the Pueblo company and in accordance with their pro rata ownership of the Pueblo company stock

---

[1] However the certificates may have been issued we agree with respondent's concession that the Grand Junction stock should be considered as having been distributed by Pueblo to petitioners for purposes of the statute. Cf. *H. Grady Lester,* 40 T.C. 947 (1963).

received stock of the Grand Junction company with a fair market value of $1 per share as follows:

|  | Shares |
| --- | --- |
| L. B. Walker | 16, 789 |
| Mildred O. Walker | 12, 591 |
| Patricia W. Burke | 2, 098 |
| Total | 31, 478 |

The Pueblo company recorded on its books the issuance of the Grand Junction company stock and the distribution of the stock pro rata to the Pueblo company stockholders as follows:

| Surplus | $31, 478. 58 |  |
| --- | --- | --- |
| Accounts receivable—G. Jct | | $31, 478. 58 |

Distribution of G. Jct. stock to stockholders of Pueblo

In April 1957, pursuant to prior understanding with L. B. Walker, H. B. Pearce conveyed a parcel of land situated in Grand Junction, Colo., to the Grand Junction company in exchange for 3,500 shares of its $1 par value stock. The Grand Junction company immediately built a store and warehouse thereon, and occupied the new building in July of 1957. The new store and warehouse was more than four times as large as the one formerly rented. Pearce still owns his Grand Junction company stock.

At the time the Grand Junction company was formed and its stock distributed to petitioners they had no plan or intention to sell or dispose of their Grand Junction company or Pueblo company stock. In fact the petitioners still retain this stock. Also, there was no intention or motive on the part of the petitioners to distribute the earnings and profits of the Pueblo company or to avoid taxes by this transaction. At the time of the distribution substantially all of the assets of both the Pueblo and Grand Junction companies were used and have been used ever since in the active conduct of a trade or business.

The Grand Junction company has prospered under the management of Pearce, who took a new interest in the business after he acquired stock therein. The Grand Junction company hired its own outside salesmen, and expanded its territory into additional areas of Utah and northwestern Colorado, formerly impossible to cover with salesmen operating out of the Pueblo store. Pearce took over the responsibility of securing suppliers and ordering merchandise and handling credit and delinquent accounts. All bills and expenses were paid by the Grand Junction company from its own bank account. Complete and separate books of account were maintained and complete periodic financial statements were prepared. Since incorporation the Grand Junction company and the Pueblo company have separately engaged in the active conduct of the trade and business of

wholesale distribution of radio, television, and other electronic parts, equipment, and supplies.

OPINION

The distribution of the stock of L. B. Walker Co. of Grand Junction in 1957 was treated by the petitioners as a tax-free distribution of stock under section 355 of the 1954 Code. That section provides that certain distributions by corporations to their shareholders of stock of controlled corporations shall qualify as tax-free distributions if certain stated requirements are met. In pertinent part the statute provides that a divisive distribution will not give rise to taxable gain or loss if the distributing corporation distributes stock of a corporation which it controls; the distribution is not principally a device for distributing earnings and profits of either corporation; the 5-year active business requirements of subsection (b) thereof are satisfied and the distributing corporation distributes all of its stock in the controlled corporation. The statute does not require that the distributing corporation be engaged in more than one trade or business prior to the distribution.

The Commissioner's determination that the distribution here in question was not entitled to tax-free treatment is based on three grounds. He contends that when the warehouse and store were acquired by the Grand Junction branch in 1954, this was the establishment of a new business which would not meet the 5-year requirement of section 355(b)(2)(B). In the alternative the Commissioner argues that if it is decided that a new business was not created but that the Grand Junction activities were merely an adjunct of the L. B. Walker Co. of Pueblo, then section 355 is not applicable since it does not apply to the division of a single business. Finally the Commissioner argues that the transaction was a device for the distribution of earnings and profits and is precluded from favorable treatment by section 355(a)(1)(B).

We have held that for a transaction to come within section 355: (1) The distributing corporation must distribute solely stock or securities of a corporation which it controlled immediately prior to the distribution; (2) the 5-year active business requirements of section 355(b) must be met; (3) the distribution must not be principally a device for distributing earnings and profits of either corporation; and (4) the distributing corporation must distribute all the stock and securities of the controlled corporation. *Albert W. Badanes*, 39 T.C. 410 (1962), *Edmund P. Coady*, 33 T.C. 771 (1960), affirmed per curiam 289 F. 2d 490 (C.A. 6, 1961).

Here the respondent contends that neither the second nor the third requirement has been met. He argues that the creation of a store

and a warehouse in Grand Junction constituted the establishment of a separate business in 1954 and consequently that business had not been operated for 5 years at the time of distribution in 1957. We are unable to concur. A separate business is defined in section 1.355–1(c), Income Tax Regs., as:

(c) *Active business.* Section 355 is not applicable unless the controlled corporation and the distributing corporation are each engaged in the active conduct of a trade or business. For specific rules in this connection see section 355(b)(1) and (2). Without regard to such rules, for purposes of section 355, a trade or business consists of a specific existing group of activities being carried on for the purpose of earning income or profit from only such group of activities, and the activities included in such group must include every operation which forms a part of, or a step in, the process of earning income or profit from such group. Such group of activities ordinarily must include the collection of income and the payment of expenses. * * *

In the instant case the Grand Junction store prior to incorporation did not carry on "every operation which forms a part of, or a step in, the process of earning income or profit from such group." It acted simply as a branch outlet closer to the area of distribution. Merchandise sold in Grand Junction was usually obtained from Pueblo and was sold by Pueblo salesmen. Over 80 percent of the merchandise sold in the Grand Junction area had to be shipped from Pueblo. Merchandise was shipped directly from the suppliers only in emergency or unusual situations. It is significant that the Grand Junction store had no outside salesmen and also had no bank account except for a transfer account. Also all the Grand Junction accounts receivable, credit matters, and collections were handled by Pueblo.

Respondent cites authority which distinguishes between the transfer of an existing business and the establishment of a new business. Rev. Rul. 56–344, 1956–2 C.B. 195; sec. 1.355–1(d), examples (8), (9), and (10), Income Tax Regs. However, in the present case we find that the acquisition of a Grand Junction store and warehouse in 1954 was only a continuation and furtherance of the existing business and not the establishment of a new business. Consequently, the business which was divided by the spin-off in 1957 had been actively conducted throughout the 5-year period preceding the distribution. As we pointed out in *Edmund P. Coady, supra*, rejecting the same arguments made by respondent here, as long as the business which is divided has been actively conducted for 5 years before the distribution and the resulting businesses are actively conducted after the division, the active business requirements of the statute are met. Cf. also *H. Grady Lester*, 40 T.C. 947 (1963).

The Commissioner's alternative argument that section 355 does not apply to the division of a single business is also rejected. Subsequent to the trial of this case and submission of briefs, the Commissioner in Rev. Rul. 64–147, 1964–1 C.B. (Part 1) 136, has agreed that section 355

applies to the division of a single business. This position now conforms with our holding in *Edmund P. Coady*, *supra*, and with *United States* v. *Marett*, 325 F. 2d 28 (C.A. 5, 1963). Any further discussion of this issue is deemed unnecessary.

We have found that the principal reason for the incorporation of the Grand Junction branch was to allow Pearce to invest in the Grand Junction operation. Substantially all of the assets of both Pueblo and Grand Junction were used in the active conduct of the trade or business prior to incorporation and have continued to be so used subsequent to incorporation and the spin-off. This is a fact which section 1.355–2(b)(3), Income Tax Regs., recognizes as evidence that the transaction was not used principally as a device for distributing earnings and profits. On examination of all the facts and circumstances of this case we find that the incorporation of Grand Junction and the distribution of its stock was dictated by business reasons and the transaction was not used principally as a device for the distribution of the earnings and profits of either corporation.

We have found that the 5-year active business requirements of section 355(b) have been met and that the distribution was not used principally as a device to distribute earnings and profits. Since it is uncontested that Pueblo distributed solely stock of Grand Junction and that all of its stock of Grand Junction was distributed we hold that all of the requirements of section 355 have been met and the petitioners are entitled to tax-free treatment.

*Decisions will be entered for the petitioners.*